[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-15283
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 30, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00131-CV-OC-10-GRJ

UNITED STATES, ex rel.,

Plaintiff,

KARYN L. WALKER,
a.k.a. Karyn L. Denk-Walker,

Plaintiff-Appellant
Cross-Appellee,

versus

R & F PROPERTIES OF LAKE COUNTY, INC.,
A Florida Professional Association,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(December 30, 2005)

Before BIRCH, WILSON and COX, Circuit Judges.

COX, Circuit Judge:

Plaintiff Karyn L. Walker is a *qui tam* relator, seeking recovery on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. § 3729. Walker appeals a summary judgment granted to Defendant R&F Properties of Lake County, Inc., formerly known as Leesburg Family Medicine, (LFM). And Walker contends that the district court erred in limiting the scope of information discoverable in the case to that information relevant to the time period during which she was employed by LFM as a nurse practitioner. LFM cross-appeals, contending that the district court erred in denying its motion to dismiss Walker's Amended Complaint.

We conclude that the district court erred in holding that Walker had not produced sufficient evidence of the falsity of the claims submitted by LFM to resist summary judgment. Therefore, we reverse the district court's judgment. We also find error in the district court's order limiting discovery. We find no error in the district court's denial of LFM's motion to dismiss.

## I. BACKGROUND & PROCEDURAL HISTORY

The Medicare Program is a system of health insurance administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services (CMS). CMS was formerly known as the Health Care Financing Administration (HCFA). Medicare Part B is a federally subsidized, voluntary health insurance program that pays a portion of the costs of

2

certain health services, including the costs of clinic visits to healthcare providers (among them, physicians, physician assistants, and nurse practitioners). Reimbursement for Medicare Part B claims is made through CMS, which contracts with private insurance carriers throughout the United States to administer and pay claims within their regions from the Medicare Trust Fund. These insurance carriers are known as Fiscal Intermediaries, or FIs. In general, when a healthcare service is rendered to a patient covered by Medicare Part B, the healthcare provider bills Medicare/CMS through the FI. The FI reviews the bill and pays the healthcare provider. CMS publishes a series of manuals that provide billing and payment instructions to the Medicare community. Among these manuals are the Medicare Carrier's Manual, directed to the FIs, and the Provider Reimbursement Manual, directed to healthcare providers.

LFM operates medical clinics in Leesburg and Lady Lake, Florida. At these clinics, physicians, physician assistants, and nurse practitioners provide medical services to the community. Many, if not most, of LFM's patients are covered by Medicare Part B. LFM submits claims for Medicare reimbursement for healthcare services rendered by physicians, physician assistants and nurse practitioners to its FI, Blue Cross Blue Shield of Florida, pursuant to a contract between LFM and Blue Cross Blue Shield. These claims are made on HCFA 1500 forms in electronic

3

form, as required by the Medicare regulations, and signed electronically by LFM's physicians.  Each HCFA 1500 form states:

> SIGNATURE OF PHYSICIAN OR SUPPLIER
> (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)
>
> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.
> For services to be considered "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

(R.2-79 Ex. G.)

Healthcare providers may bill Medicare Part B for the services of physician assistants and nurse practitioners in one of two ways; the amount of reimbursement the providers receive is dependent on the billing method.  Physician assistant or nurse practitioner services may be billed as services "incident to the service of a physician."  42 CFR §§ 410.10, 410.26.  To be correctly billed in this manner, the physician assistant or nurse practitioner services must have been provided under certain circumstances.[1]  When physician assistant or nurse practitioner services are

---

[1]For the relevant time period prior to January 1, 2002, 42 CFR § 410.26 stated:

billed as "incident to the service of a physician," the physician's Unique Provider

Identification Number (UPIN) is used on the bill submitted to the FI.

Alternatively, a provider may bill Medicare for physician assistant and nurse

> (a) Medicare Part B pays for services and supplies incident to a physician's professional services, including drugs and biologicals that cannot be self-administered, if the services or supplies are of the type that are commonly furnished in a physician's office or clinic, and are commonly furnished either without charge, or included in the physician's bill.

Effective January 1, 2002, 42 CFR § 410.26 was amended to read, in relevant part:

> (b) Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner).
> (1) Services and supplies must be furnished in a noninstitutional setting to noninstitutional patients.
> (2) Services and supplies must be an integral, though incidental, part of the service of a physician (or other practitioner) in the course of diagnosis or treatment of an injury or illness.
> (3) Services and supplies must be commonly furnished without charge or included in the bill of a physician (or other practitioner).
> (4) Services and supplies must be of a type that are commonly furnished in the office or clinic of a physician (or other practitioner).
> (5) Services and supplies must be furnished under the direct supervision of the physician (or other practitioner). The physician (or other practitioner) directly supervising the auxiliary personnel need not be the same physician (or other practitioner) upon whose professional service the incident to service is based.
> . . .

"Direct supervision," as used in 42 CFR § 410.26, is defined by reference to 42 CFR § 410.32(b)(3)(ii), a provision that, since 1998, states:

> *Direct supervision* in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.

practitioner services under the physician assistant's or nurse practitioner's own UPIN. Billing Medicare in this second way indicates that the physician assistant or nurse practitioner has performed the service under some level of supervision by a physician, but the requirements of 42 CFR § 410.26 have not necessarily been met. For services billed under a physician assistant's or nurse practitioner's UPIN, the FI pays 85% of what it would pay for the same services billed under a physician's UPIN.

Walker worked for LFM from February 1997 until May 1999 as a nurse practitioner. During that time, there were many occasions when she saw patients independently without physician supervision. Physicians were not always physically present in the LFM clinic while Walker and other nurse practitioners and physician assistants saw patients, but physicians were always available for consultation by pager and telephone.

## II. CONTENTIONS OF THE PARTIES

Walker brings this suit as a *qui tam* relator under the False Claims Act. She alleges that LFM filed false claims for Medicare reimbursement by billing Medicare for services rendered by nurse practitioners and physician assistants as if those services were rendered "incident to the service of a physician," even though LFM knew that the nurse practitioner and physician assistant services did not meet several of the criteria necessary for billing in that manner. Chief among Walker's

6

complaints is that LFM billed all nurse practitioner and physician assistant services as "incident to the service of a physician," even though the nurse practitioners and physician assistants often treated patients at LFM's clinics when no physician was physically present in the clinic. She contends that a physician's physical presence within the office suite was required in order for the nurse practitioner's or physician assistant's service to have been rendered "incident to the service of a physician," as used in 42 CFR § 410.26 and "under the physician's immediate personal supervision" as certified by the physician on each HCFA 1500 claim form. Walker further contends that LFM knew that its billing practice was fraudulent and that LFM knew the proper way to bill the services (as services rendered directly by the nurse practitioner or physician assistant rather than as services "incident to the service of a physician"). Walker alleges that, as a result of the fraudulent manner in which LFM billed Medicare, LFM was paid 15% more than it should have been paid for nurse practitioner and physician assistant services to Medicare patients.

LFM admits that physicians were not always physically present in the clinic while nurse practitioners and physician assistants treated patients. LFM also admits that it submitted HCFA 1500 forms to Blue Cross Blue Shield requesting Medicare reimbursement for services of nurse practitioners and physician assistants performed "incident to the service of a physician," even if the nurse

7

practitioner and physician assistant services were performed while no physician was physically present in the LFM office suite. LFM further concedes that the submission of the HCFA 1500 forms constitutes the presentation of claims for purposes of the False Claims Act. However, LFM argues that, as a matter of law, these claims could not have been false within the meaning of the False Claims Act because the phrase "incident to the service of a physician" was, at least until January 1, 2002, vague and subject to reasonable interpretations other than that championed by Walker. It further argues that the "immediate personal supervision" language in the HCFA 1500 certification is similarly vague and therefore, as a matter of law, cannot be the basis for a false claim.

The parties also disagree about the time period relevant to Walker's lawsuit. Walker maintains that LFM made false claims for physician assistant and nurse practitioner services performed from the time it first hired a physician assistant in 1994 through the date Walker filed her complaint, and she argues that her complaint properly alleges the existence of false claims throughout this entire period. LFM, on the other hand, contends that Walker could allege properly only that false claims were presented from February 1997 through May 1999, the dates of her employment at LFM.[2]

---

[2]According to LFM, however, this is a hypothetical. LFM contends that Walker's Amended Complaint does not properly plead any cause of action regarding any time period and that it should have been dismissed by the district court because it is not specific enough to satisfy the pleading

8

The district court granted LFM summary judgment because it found that LFM's requests for reimbursement could not be false as a matter of law. The district court reasoned that, because the Medicare statutes and regulations in effect during the period of Walker's employment with LFM did not adequately define the phrase "incident to the service of a physician" and because the terms "immediate," "integral," and "incidental" as used on the HCFA 1500 form "are inherently imprecise," LFM's interpretation of the terms (that nurse practitioners and physician assistants could see patients independently so long as a physician was available by pager and telephone) must be accepted as reasonable. In opposition to LFM's motion for summary judgment, Walker offered evidence of how the regulatory language and the HCFA 1500 certification language were interpreted in the Medicare community. Walker contends that this evidence would support a finding that the claims submitted were false. However, the district court considered the evidence insufficient to present an issue of fact as to the meaning of the terms.

### III. ISSUES ON APPEAL

To determine whether the district court erred in granting summary judgment, we must decide whether the Medicare regulations and HCFA 1500 form are

---

requirements of Federal Rule of Civil Procedure 9(b).

9

unclear regarding the criteria that must be fulfilled in order for services of a nurse practitioner or physician assistant to be billed as services "incident to the service of a physician." If we decide that they are unclear, we must then decide whether a court may look to evidence other than the language of the regulation and form to determine whether a claim, allegedly submitted in violation of that language, is false within the meaning of the False Claims Act. If we decide that a court may look to evidence outside the language at issue, we must determine whether the evidence Walker presented in opposition to LFM's motion for summary judgment is sufficient to create an issue of fact as to the falsity of the claims LFM made to Medicare.

We also decide whether the district court erred in limiting discovery in the action to information relevant to the time period during which Walker was employed by LFM.

Finally, to decide LFM's cross-appeal, we determine whether Walker's Amended Complaint satisfies the requirements of Rule 9(b).

## IV. STANDARDS OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same legal standards that bound that court and "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d

10

1199, 1203 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The district court's discovery decisions are reviewed for abuse of discretion. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999).

We review de novo the denial of a motion to dismiss. *See Nolen v. Jackson*, 102 F.3d 1187, 1190 (11th Cir. 1997).

## V. DISCUSSION

The False Claims Act states:

> Any person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a). The False Claims Act authorizes private citizens to bring actions on behalf of the United States. 31 U.S.C. § 3730(b). These plaintiffs are known as *qui tam* relators. To establish a cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. 31 U.S.C. § 3729(a). Recovery under the False Claims Act is not measured by the amount of

11

any actual damage a relator might have sustained personally as a result of a defendant's false claim. Rather, the relator stands in the shoes of the United States government. She can prosecute the lawsuit on the United States' behalf, and recover, for the United States, the losses attributable to any fraudulent claim and the civil penalty authorized by the statute. 31 U.S.C. § 3730.

## A. The Grant of Summary Judgment

In this case, the district court granted summary judgment for LFM because it found that, as a matter of law, Walker's complaint and evidence did not present the possibility of a false or fraudulent claim. As stated above, the district court found that the regulatory language that Walker claimed was violated when LFM submitted its claims was ambiguous and therefore could not, as a matter of law, serve as the predicate for a false claims action. We find error in the district court's reasoning.

First, we note that the district court granted LFM summary judgment on Walker's entire complaint even though a subset of the claims alleged by Walker were allegedly submitted after the Medicare regulation had been amended and clarified. *See supra* n.1. As of January 1, 2002 (four months before Walker filed her original complaint in this case), the regulation providing conditions for coverage of services rendered "incident to the service of a physician" was clear about the meaning of that phrase. As of that date, all services billed as "incident to

12

the services of a physician" must have been rendered under a physician's "direct supervision." 42 CFR § 410.26(b)(5) (2002). In order to satisfy this "direct supervision" requirement, "the physician must [have been] present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 CFR § 410.26(a)(2) (2002), 410.32(b)(3)(ii) (2002). This regulatory language unambiguously requires that a physician be present in the office. Furthermore, this new regulatory language illuminates the meaning of the physician certification on the HCFA 1500 form that the billed services "were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision," at least as of January 1, 2002.

Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. *See United States v. Calhoon*, 97 F.3d 518, 524 (11th Cir. 1996); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). Given the clear definition of services rendered "incident to the service of a physician" that became effective January 1, 2002, Walker should be permitted to present evidence to a fact-finder supporting her allegations that any Medicare claims LFM submitted from January 1, 2002 until the date of her complaint for services of nurse practitioners or physician assistants

13

"incident to the service of a physician," were not, in fact, rendered in compliance with the applicable Medicare regulation and, therefore, were false. An issue of fact also exists as to whether LFM physician certifications on the HCFA 1500 forms submitted from January 1, 2002 until the date of Walker's complaint were false.

Additionally, the district court erred by holding that any ambiguity in the earlier version of 42 CFR § 410.26 and the HCFA 1500 certification necessarily forecloses, as a matter of law, the falsity of claims submitted by LFM prior to January 1, 2002. We agree that the regulatory language in effect until January 1, 2002 was ambiguous. But we disagree as to the legal significance of that ambiguity. In opposition to LFM's motion for summary judgment, Walker submitted provisions from the Medicare Carrier's Manual, Medicare bulletins, seminar programs, and expert testimony regarding proper billing "incident to the service of a physician," as used in 42 U.S.C. § 410.26. She also presented two notes written by LFM's employee that paraphrase a billing consultant's advice. All of these sources were offered to show the meaning of the language in the regulation and on the HCFA 1500 form and the reasonableness of LFM's claimed understanding of that language. At least some of these sources would support a finding that, in the Medicare community, the language was understood to mean that a physician had to be physically present in the office suite and otherwise more

14

involved in a patient's course of care than the LFM physicians were. The district court considered this evidence irrelevant and held that, because none of it held the force of law, it could not be the basis for a false claim.

As the district court recognized, the Supreme Court has stated that agency interpretations contained in policy statements, manuals, and enforcement guidelines are not entitled to the force of law. *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662 (2000). For that reason, we agree with the district court that evidence of a defendant's failure to comply with an administrative guideline does not necessarily establish that the defendant presented legally false claims–claims in violation of a statute or regulation–to the United States. But that is not the issue here. What is at issue is whether any evidence outside the language of a Medicare regulation (including guidance issued by the governmental agency charged with administering the regulatory scheme) can be consulted to understand the meaning of that regulation. We hold that it can.

The Supreme Court has held that agency interpretations are "entitled to respect . . . to the extent that those interpretations have the power to persuade." *Id.*, 120 S. Ct. at 1663 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944)). Our precedent is consistent. Indeed, we have followed this rule in the context of Medicare false claims cases. In affirming a criminal false claims

15

conviction, this court looked to a manual published by HCFA to determine the meaning of a Medicare regulation and establish the falsity of the defendant's claims for Medicare reimbursement. *See Calhoon*, 97 F.3d at 526 (consulting the Provider Reimbursement Manual to define the meaning of a phrase in the Medicare regulations). The fact that the Medicare Carrier's Manual was not issued to Defendants does not negate its probative value regarding the meaning of a Medicare regulation. *See United States v. Gold*, 743 F.2d 800, 816 (11th Cir. 1984) (affirming criminal conviction of eye doctor for Medicare fraud and approving admission of Medicare Carrier's Manual provisions as evidence of what types of claims were properly payable under Medicare).

In a case remarkably similar to this one, the Eighth Circuit recently held, "If a statement alleged to be false is ambiguous, the government (or here, the relator) must establish the defendant's knowledge of the falsity of the statement, <u>which it can do by introducing evidence of how the statement would have been understood in context</u>." *Minnesota Assoc. of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (emphasis added). In the Minnesota case, the relator alleged that anesthesiologists billed Medicare as if they had "personally performed" an entire anesthesia case or were "continuously involved" in the performance of that case when, in fact, they were not continuously present during

16

the case and were instead simultaneously engaged in other activities. *Id.* at 1037, 1038. A district court granted the defendants summary judgment because the court considered the Medicare regulation's phrases "personally performed" and "continuously involved" to be ambiguous. *Id.* at 1052-1053. The Eighth Circuit reversed, stating, "If the [relator] shows the defendants certified compliance with the regulation knowing that the HCFA interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the HCFA interpreted it, any possible ambiguity of the regulations is water under the bridge." *Id.* at 1053. The Eighth Circuit found that evidence presented by the relator (including the defendants' attorney's advice, HCFA memoranda, a bulletin published by the FI, and an American Society of Anesthesiologists newsletter) was relevant to a determination of the Medicare regulation's meaning and that there was a question of fact as to the defendants' understanding of the meaning of the regulatory language. *Id.* at 1053-54.

In opposition to LFM's motion for summary judgment, Walker presented provisions from the Medicare Carrier's Manual in use during the relevant time period[3], bulletins published by the FI (and received and maintained by LFM) that

_____

[3]The parties agree that, throughout the time period relevant to this lawsuit (whatever that might be), the Medicare Carrier's Manual set forth five criteria for a service to be covered as "incident to the services of a physician." To be covered, a service must: (1) be an integral, although incidental, part of the physician's professional service; (2) be commonly rendered without charge or included in the physician's bill; (3) be of the type commonly furnished in physicians' offices or

17

provide guidance on proper "incident to the service of a physician" billing,
programs for seminars attended by LFM personnel that reviewed information on
proper "incident to the service of a physician" billing, and copies of notes
handwritten by LFM personnel documenting conversations between LFM
administrative personnel and a billing consultant regarding the need for UPINs for
physician assistants and nurse practitioners. Each of these pieces of evidence is
relevant to the meaning of the Medicare regulation at issue and LFM's
understanding of that meaning. *See Gold*, 743 F.2d at 816 (Medicare Carrier's
Manual and FI letter to provider properly admitted into evidence). Taken together,
they are sufficient to support findings that the Medicare regulation required that a
physician be physically present in the office suite and otherwise more involved in a
patient's course of care than the LFM physicians were and that LFM knew of these
requirements. Thus, they raise an issue of fact as to the falsity of LFM's billing for

---

clinics; (4) be furnished under the direct personal supervision of a physician; and (5) be furnished by a physician or an employee of a physician. Medicare Carriers Manual Part 3, Claims Process Pub. 14-3 (MCM), § 2050, at 2-19.

The parties also agree that, since at least 1992, the MCM has defined "direct personal supervision in the office setting" to require that "the physician must be present in the office suite and immediately available to provide assistance and direction throughout the time the aide is performing services." MCM, § 2050.1.B. at 2-20.

The parties disagree, however, regarding the meaning of other language in the MCM, particularly the language in MCM, § 2050.2, that states "there must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the nonphysician practitioner is an incidental part, and there must be subsequent services by the physician of a frequency that reflects his or her continuing active participation in and management of the course of treatment." *Id.* at 2-21.

nurse practitioner and physician assistant services "incident to the service of a physician." Summary judgment was inappropriate.

## B. The Limit on Discovery

Walker also challenges the district court's decision to limit discovery in the case to the date range of her employment as a nurse practitioner at LFM. She correctly states that, if, in limiting the temporal scope of discovery, the district court "made a clear error of judgment . . . or . . . applied an incorrect legal standard," we must reverse that decision. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004) (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1326 (11th Cir. 2000)).[4]

We find that the district court misconstrued the False Claims Act when it limited discovery to the term of Walker's employment. We therefore reverse the discovery order. Under the False Claims Act, any person may serve as a *qui tam* relator. 31 U.S.C. § 3730(b). The relator need not have any relation at all to the defendant. *Id.* Neither is there a requirement that the relator suffer injury at the hands of the defendant in order to state a claim under the False Claims Act. *Id.* "The United States is the real party in interest in a qui tam action under the FCA even if it is not controlling the litigation." *United States ex rel. Dimartino v.*

---

[4]Walker raised this issue in her initial brief, but LFM did not respond or otherwise address the argument in any of its briefing.

19

*Intelligent Decisions, Inc.*, 308 F.Supp. 2d. 1318, 1322 n.8 (M.D. Fla. 2004) (citing

*United States ex rel. Rodgers v. Arkansas*, 154 F.3d 865, 868 (8th Cir.1998);

*United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1217 n. 8 (9th

Cir.1996); *United States ex rel. Milam v. University of Texas M.D. Anderson*

*Cancer Center*, 961 F.2d 46, 48-49 (4th Cir.1992)).

Under the Federal Rules of Civil Procedure, discovery is limited to

"matter[s], not privileged, that [are] relevant to the claim or defense of any party . .

. . Relevant information need not be admissible at the trial if the discovery appears

reasonably calculated to lead to the discovery of admissible evidence." Fed. R.

Civ. P. 26(b)(1). Thus, Walker should have been permitted discovery of all

information relevant to her claims, on behalf of the United States, that false claims

for payment were made by LFM.

An examination of the Amended Complaint, the operative pleading in this

case, demonstrates that Walker alleges that LFM submitted false claims from at

least the time of Walker's hiring[5] into the undefined future. Paragraph 11 of the

Amended Complaint recounts a conversation that Walker allegedly had with

LFM's office manager, Gail Mayer. As part of that conversation, Mayer allegedly

---

[5]Walker argues that discovery should be allowed from as far back as 1994, when LFM first hired a physician assistant (a fact that Walker learned from deposition testimony of LFM's office administrator). However, the Amended Complaint does not make any allegation that a physician assistant or nurse practitioner was employed at LFM prior to February 1997.

20

told Walker that LFM "never" billed nurse practitioner and physician assistant services as independent services but rather always billed them as services "incident to the service of a physician" and that if LFM were to bill the nurse practitioner and physician assistant services as independent services, "it could not afford to employ [Walker]." Amended Complaint ¶ 11. The same paragraph further alleges, "LFM's Medicare billing practices did not change subsequent to [Walker's] conversation with Gail Mayer." *Id.* Paragraph 9 of the Amended Complaint states, "Since [Walker's] employment with LFM, LFM has employed at least two more nurse practitioners and two more physician's assistants." Thus, the Amended Complaint does not limit the allegations of false claims to the time period during which Walker was employed by LFM. Rather, it alleges an ongoing practice of false billing from the time Walker began working as a nurse practitioner at LFM, in February 1997. The proper temporal range for discovery is February 1997 through the date of the original complaint.

## C. The Denial of the Motion to Dismiss

Finally, LFM cross-appeals, arguing that the district court erred in denying LFM's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the Amended Complaint. The motion was grounded on the assertion that the Amended Complaint failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). We find this argument meritless.

21

This is not a case like *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002), in which a "corporate outsider" made speculative assertions that claims "must have been submitted, were likely submitted or should have been submitted to the Government." 290 F.3d at 1311. Neither is this case like *Corsello v. Lincare, Inc.*, 428 F.3d 1008 (11th Cir. 2005), in which we recently affirmed the district court's dismissal on the ground that the relator's complaint was deficient under Rule 9(b) because it "failed to explain why he believe[d] fraudulent claims were ultimately submitted." 428 F.3d at 1014.

Walker's complaint identifies her as a nurse practitioner who was employed at LFM. Amended Complaint ¶7. Walker alleges that, during her employment at LFM, she never had her own UPIN and that she was instructed each day "which doctor she would be billing under." Amended Complaint ¶¶ 11, 15. The Amended Complaint also alleges that Walker had at least one personal discussion with LFM's office administrator (identified in the complaint by name) during which the two women discussed that Walker did not have her own UPIN, whether Walker and the other nurse practitioners and physician assistants should have their own UPINs, that (according to the office administrator) LFM billed all nurse practitioner and physician assistant services as rendered "incident to the service of a physician," that (also according to the office administrator) LFM had "never"

22

billed nurse practitioner or physician assistant services in another manner, and the propriety of the billing method. Amended Complaint ¶¶ 10-12. These allegations are sufficient to explain why Walker believed LFM submitted false or fraudulent claims for services rendered by nurse practitioners and physician assistants "incident to the service of a physician." Therefore, we affirm the district court's order denying LFM's motion to dismiss Walker's complaint.

## VI. CONCLUSION

For the reasons stated above, we reverse the grant of summary judgment in favor of R&F Properties of Lake County, Inc., formerly known as Leesburg Family Medicine. We find no error in the district court's denial of R&F Properties of Lake County, Inc.'s motion to dismiss the Amended Complaint. Finally, we conclude that the district court erred in limiting the temporal scope of discovery and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.