[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11080

_____

JAIME VARGAS,
United States of America, Ex Rel.,
FRANCIS R. ALVAREZ,

                                                          Plaintiffs-Appellants,

*versus*

LINCARE, INC.,
OPTIGEN, INC.,

                                                          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 3:16-cv-01329-HLA-PDB

—————————

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case presents a familiar scenario in False Claims Act (FCA) litigation: a qui tam relator alleges widespread fraud, only for the district court to dismiss the case for failing to plead the fraud with the requisite specificity. The relators here, former employees of medical supplier Lincare, Inc., and its subsidiary Optigen, Inc., allege an array of misconduct, including systematic upcoding of durable medical equipment, improper kickback arrangements, waiver of co-pays, and shipment of unordered supplies. The District Court dismissed their fourth amended complaint for failing to plead sufficient facts to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.

We affirm in part and reverse in part. While the relators' allegations of upcoding—wherein Optigen allegedly billed for incorrect batteries and accessories—are pleaded with sufficient specificity to withstand a motion to dismiss, their remaining claims fall well short of the mark. We therefore reverse the dismissal of the upcoding claim and remand for further proceedings but affirm the dismissal of all other claims.

# I.    Background

## A.    *Procedural History*

This case's procedural history is long and winding. In April 2016, relator Jaime Vargas filed a sealed qui tam complaint in the Eastern District of Virginia, alleging that defendant Optigen engaged in a variety of fraudulent practices. Later that year, the case was transferred to the Middle District of Florida, where Vargas filed a sealed first amended complaint in 2017. The United States declined to intervene in 2020, and the District Court unsealed the complaint.

Vargas served defendants Lincare and Optigen with the first amended complaint in March 2021, and soon after sought leave to file a second amended complaint. The Magistrate Judge allowed the amendment but warned that the proposed complaint was a shotgun pleading. The Judge's order stated:

> Vargas is cautioned that the current proposed second amended complaint is an improper "shotgun pleading," at a minimum because paragraph 79 incorporates all preceding allegations. . . . **If Vargas files a shotgun pleading, the Court will strike it and may not permit further amendment.**

Vargas, now joined by relator Francis Alvarez, went ahead and filed the proposed complaint anyway. The Magistrate Judge sua sponte struck it and issued an order to show cause why further amendment should be allowed. The relators' counsel responded that she only saw the docket entry allowing the second amended complaint to be filed, but she did not actually read the

order.[1] In addition, the relators' counsel argued (incorrectly) that the second amended complaint was not a shotgun pleading. After a telephonic status conference, the Court allowed another amendment.

The relators filed a third amended complaint in October 2021. The defendants moved to dismiss it. The District Court granted the motion, explaining that the relators' fraud theories "lack[ed] sufficient factual allegations to demonstrate that Relators are entitled to relief. Rather, the relators' theories of fraud are based on speculative and vague assertions and legal conclusions." And remarkably, the Court highlighted that "Plaintiff has once again filed a complaint that is an impermissible 'shotgun pleading,' in part, because paragraph 91 incorporates all preceding allegations."

In November 2022, the relators made yet another attempt, filing a fourth amended complaint. The defendants again moved to dismiss it. The District Court granted the motion, dismissing the complaint and holding that it still failed to meet Rule 9(b)'s heightened pleading standard.

## B.    *Pertinent Allegations*

Optigen, a Florida-based subsidiary of Lincare, specializes in supplying respiratory therapy equipment, particularly continuous positive airway pressure (CPAP) devices. CPAP therapy treats obstructive sleep apnea, a condition where a patient's airway re-

---

[1] The ECF entry had an underlined sentence to "See order for details."

peatedly collapses during sleep. A CPAP machine prevents these collapses by delivering a constant stream of pressurized air through a mask, ensuring uninterrupted breathing. CPAP therapy is non-invasive and, while important for sleep quality and long-term health, it does not provide life-sustaining ventilation. Unlike ventilators—used for patients who cannot breathe on their own—CPAP machines merely assist natural respiration and do not require backup power to prevent immediate harm in case of power failure.

The relators, as noted, are Jaime Vargas and Francis R. Alvarez. Vargas, a registered respiratory therapist, managed clinical training and operational compliance across Lincare and later Optigen, including auditing patient files and overseeing CPAP setup practices. Alvarez began working for Optigen in 2004 as its first Contract Field Technician (CFT) and later became a Regional Health Care Services Manager for the Optigen division of Lincare. In that role, he trained CFTs, supervised operations, and reviewed patient files.

Tricare, the health insurance program for military personnel and their families, covers CPAP equipment and replacement supplies when medically necessary. But Tricare, like Medicare, imposes strict billing regulations: CPAP equipment must be properly coded, co-pays must be collected unless waived for genuine financial hardship, and suppliers may only ship replacement supplies if medically necessary. And the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits medical providers from paying for re-

ferrals. According to the relators, the defendants ignored all these rules. Their allegations describe four fraudulent schemes.

The first scheme turned on improper billing. CPAP machines typically plug into an AC outlet, but some patients, especially military personnel, use battery packs. The problem for Optigen was that Tricare did not regularly reimburse CPAP batteries because CPAP therapy, unlike ventilator support, is not life-sustaining. Ventilator patients—who rely on machines to breathe—require backup power to prevent suffocation during outages, so Tricare covers ventilator batteries at higher reimbursement rates. The relators allege that Optigen took advantage of this disparity by systematically billing CPAP batteries, chargers, and cables under the codes designated for ventilator accessories. This misclassification allowed Optigen to obtain reimbursement for items that should not have been covered at all—let alone at the inflated rates set for life-critical equipment.

The second scheme involved the routine waiver of patient co-pays. Tricare and Medicare require patients to pay co-pays: a portion of their medical expenses to deter overuse and ensure accountability. Federal law prohibits suppliers from waiving co-pays except in limited cases of financial hardship, which must be documented. Rather than assessing hardship case by case, however, Optigen included a pre-filled waiver form in every new patient's CPAP setup package. Patients were not required to submit financial information—just a signature.

24-11080                Opinion of the Court                    7

The third scheme centered on automatic shipments of CPAP supplies. Tricare covers replacement CPAP masks, cushions, headgear, and filters on a periodic basis, but only when a patient or provider requests them. Optigen, the relators say, bypassed this requirement by shipping replacement supplies to every CPAP patient at regular intervals—whether they wanted them or not. This practice, they claim, was not accidental. Lincare measured the performance of Optigen employees and locations based on how many supply reorders they processed each month. As a result, employees were pressured to push shipments, even when not medically necessary. Many patients allegedly found themselves accumulating unopened boxes of equipment they did not need. Optigen still billed Tricare, relying on the fact that returns were generally prohibited after 30 days. Relator Vargas, as a regional manager, claims he repeatedly instructed employees to ship only upon request but saw no change.

The fourth scheme involved illegal kickbacks to healthcare providers. CPAP prescriptions originate with doctors and sleep clinics, which can direct patients to a particular supplier. Optigen, the relators allege, ensured it was the preferred supplier by paying "setup fees" to the CFTs who installed CPAP equipment. These CFTs were often employees of sleep labs or medical offices who had influence over which supplier a patient used. The relators claim that Optigen structured its payments to secure as many referrals as possible—violating the Anti-Kickback Statute. New CFTs typically received $50 per setup, but the most prolific referrers—the CFTs who funneled the most patients to Optigen—

received as much as $225 per installation. Beyond setup fees, Optigen allegedly courted referring providers with meals, gifts, and other incentives.  In one instance, according to the relators, an Optigen contractor bought over $300 worth of food for medical staff at the direction of an Optigen regional sales manager.

Taken together, the relators claim, these four schemes violated the FCA. Whether these allegations satisfy Rule 9(b) is the question before us.

## II.    Discussion

The False Claims Act is the government's primary weapon against fraud in federal programs. *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1298 (11th Cir. 2021). It imposes liability on any person who, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). But the FCA does not rely solely on government enforcement. It deputizes private individuals—known as relators—to bring suit on the government's behalf in what are called qui tam actions.[2] 31 U.S.C. § 3730(b). If successful, the relator receives a share of the recovery, creating a powerful financial incentive to root out fraud. *See id.* § 3730(d).

---

[2] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 768 n.1 120 S. Ct. 1858, 1860 n.1 (2000).

That structure has benefits and costs. On the one hand, relators may expose fraud the government would otherwise miss. On the other, the FCA's bounty system may tempt opportunists to file speculative lawsuits, hoping to pressure settlements from businesses unwilling to endure protracted litigation. Recognizing that risk, courts have long held that FCA claims must clear a high pleading bar.

That bar comes from Federal Rule of Civil Procedure 9(b), which provides that a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." General allegations are not enough. An FCA complaint must spell out the fraud in detail—what happened, who did it, when and where it occurred, and how it amounted to fraud. *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009).

But even that is not enough. The FCA targets false claims—not regulatory violations, not internal misconduct, and not abstract theories untethered from government payment. *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). As we have said, "the submission of a claim is . . . the *sine qua non* of a False Claims Act violation." *Id*. So to state a viable FCA claim, a relator must allege not just a scheme, but a scheme that actually led to false claims being submitted to the government—and he must do so with particularity.

The most direct way to satisfy that requirement is by identifying specific claims submitted to the government: invoices, billing records, reimbursement forms. *See Hopper*, 588 F.3d at 1326.

But Rule 9(b) does not always require documentary proof at the pleading stage. A relator can satisfy the rule by other means—so long as he still pleads the submission of a claim with "sufficient indicia of reliability." *See U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357–58 (11th Cir. 2006); *see also Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) ("Allegations of date, time, or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.").

Whether an allegation is reliable depends on context. *See Atkins*, 470 F.3d at 1358 (emphasizing that we determine whether a claim has "sufficient indicia of reliability . . . on a case-by-case basis."). In *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, for example, the relator alleged first-hand knowledge of the defendants' billing practices. 433 F.3d 1349, 1360 (11th Cir. 2005). She described specific conversations and observations that supported her belief that a particular defendant submitted false claims. *Id.* That was enough. *See id.*; *see also Hopper*, 588 F.3d at 1326 (distinguishing *Walker* from a case where "[t]he complaint does little more than hazard a guess").

By contrast, *Atkins* illustrates what is not enough. There, the relator was a psychiatrist who suspected his employer was submitting false claims. 470 F.3d at 1359. He identified patients and procedures he thought should not have been reimbursable—but he had no role in billing and no personal knowledge of what claims were actually submitted. *Id.* His allegations rested on "ru-

mors from staff" and his own opinions about others' conduct. *Id.* That was not enough. *See id.* Without a clear link between the alleged scheme and actual claims, the complaint failed. *See id.*

In the end, an FCA claim must do more than sketch out a theory. It must allege facts showing that a false claim was actually submitted to the government. The relators here contend they have met this standard. The defendants argue, and the District Court found, that they did not. We now turn to each scheme.

### A.    The Battery Upcoding Scheme

First, the relators allege that Optigen engaged in a scheme to defraud Tricare by billing CPAP batteries, chargers, and cables under HCPCS codes[3] designated for ventilator accessories: A4611

---

[3] As the Fifth Circuit explains,

> [F]or a supplier to obtain reimbursement . . . , the supplier must identify its products using a coding system known as the Healthcare Common Procedure Coding System ("HCPCS"). The HCPCS is maintained by the HCPCS Alpha-Numeric Editorial Panel . . . , which decides whether a new code should be created for a product or whether the product fits within an existing code. . . . Each HCPCS code describes a category of products, and each product fitting the description is billed to Medicare under that code. Durable medical equipment that does not match the description of a specific HCPCS code is billed using code E1399, for miscellaneous products, a code that is processed by hand rather than computer.

*United States v. Medica Rents Co. Ltd.*, No. 03-11297, 2008 WL 3876307, at *1 (5th Cir. Aug. 19, 2008).

(ventilator battery), A4612 (ventilator battery charger), and A4613 (ventilator battery cables). According to the relators, Tricare does not cover CPAP batteries under standard billing codes. So Optigen allegedly secured payments for equipment that either should not have been covered at all or should have been reimbursed at a lower rate.

To support their claims, the relators provide specific allegations. Consider "Patient A," a service member treated for sleep apnea. His physician ordered supplies from Optigen, and Optigen submitted a claim (Claim Record No. 2010064FL998011055535) to United Healthcare, Tricare's administrator. The claim was coded as A4611—a ventilator battery. The relators allege that Tricare paid the claim. The hitch, according to the relators, is that Optigen never provided Patient A with a ventilator battery—Patient A had a CPAP machine, not a ventilator. The relators offered similar allegations for numerous other patients. They even attached a spreadsheet listing exemplar claims, identifying patients, billing codes, and reimbursement amounts.

The defendants argue that these allegations are not enough for two reasons. First, they contend the relators' allegations lack the "indicia of reliability" necessary to show that an actual claim was submitted to the government. Second, they insist that even if claims were submitted, they were not false.

### 1.      Reliability

First, the defendants argue that because the relators have no firsthand knowledge of the claims in their spreadsheet, their

24-11080                Opinion of the Court                13

assertions are based on "information and belief." And they invoke our decision in *Clausen* for the proposition that "pleadings generally cannot be based on information and belief." *See Clausen*, 290 F.3d at 1310. But that argument misses key points.

For one, the relators do not only allege fraud "on information and belief." They allege that they audited patient files—including billing correspondence and authorizations for payment. That kind of hands-on access to primary records gives them the type of inside information that are sufficient at the pleading stage.[4]

More than that, the complaint offers the details we found lacking in *Clausen*. There, the relator relied "exclusively on conclusory allegations of fraudulent billing." *Id.* at 1311 (internal quotation marks omitted). As we explained:

> Clausen merely offers conclusory statements, and does not adequately allege when—or even if—the schemes were brought to fruition. He merely alleged that "these practices resulted in the submission of false claims for payment to the United States." No amounts of charges were identified. No actual dates were alleged. No policies about billing or even second-hand information about billing practices were

---

[4] The relators argue that attaching actual billing data, by itself, satisfies Rule 9(b) and makes any further showing of reliability unnecessary. Not so. Relators must still allege facts showing that the data reflect actual claims submitted to the government. Otherwise, any relator could repackage conjecture as "billing data" and sidestep Rule 9(b) entirely.

> described . . . . No copy of a single bill or payment
> was provided.

*Id*. at 1312.

Not so here. The relators identify specific claims, with dates, amounts, and billing codes. Unlike vague assertions or theories, the relators allege specific instances of upcoding. That is more than enough to distinguish this case from cases like *Clausen*.

At its core, the defendants confuse pleading with proof. At the motion-to-dismiss stage, we take the plaintiff's well-pleaded allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S. Ct. 1937, 1949–50 (2009). That does not change in FCA cases. "[W]hen Rule 9(b) applies to a complaint, a plaintiff is not expected to actually prove his allegations, and we defer to the properly pleaded allegations of the complaint." *Clausen*, 290 F.3d at 1313. The question is not whether the relators have proved fraud; it is whether they have alleged it with particularity. They have.

### 2.    Falsity

Next, falsity. The defendants maintain that because Tricare lacked a specific billing code for CPAP batteries, it allowed providers to use ventilator battery codes instead. In support, they cite exhibits attached to the relators' own complaint, which they say reflect Tricare's instruction or acquiescence. If that were true—if Tricare authorized the use of ventilator codes for CPAP equipment—then the claims submitted would not be false, and the relators' theory would fall apart.

24-11080                Opinion of the Court                15

But that argument is premature. Again, at the motion-to-dismiss stage, we accept the complaint's well-pleaded allegations as true and draw all reasonable inferences in the relators' favor. *See Ashcroft*, 556 U.S. at 678–79, 129 S. Ct. at 1949–50. The relators allege that Optigen billed for CPAP equipment—batteries, chargers, and cables—using HCPCS codes designated for ventilator accessories, which they claim Tricare did not authorize. On its face, the complaint plausibly alleges that the coding practice was improper and that the resulting claims were false.

To be sure, there is no real dispute about the face of the codes themselves: A4611, A4612, and A4613 are expressly designated for ventilator batteries and accessories. Nor can the defendants dispute that the HCPCS has a catch-all code—E1399—for miscellaneous equipment not otherwise covered. The dispute, instead, is over what those codes meant in practice: whether the government knowingly allowed providers to use ventilator codes for CPAP devices. That is a factual dispute. And factual disputes are not grounds for dismissal at this stage.

The exhibits that the defendants invoke do not compel a different conclusion. Those exhibits—attached by the relators—are not formal policy documents, nor do they definitively establish that the government sanctioned the practice. At most, they support the defendants' position in that factual dispute. And again, that is not enough at this stage.

In sum, the relators allege a scheme, identify specific claims allegedly paid by the government, and explain why the coding was improper. The District Court erred in dismissing this claim.

### B.    The Patient Co-Pay Waiver Scheme

The relators next allege that Optigen routinely waived patient co-pays without assessing financial hardship, in violation of federal law. They assert that every CPAP setup package included a standardized waiver form that required only a patient's signature—without any income verification, documentation, or individualized review.

It is true that federal law permits co-pay waivers only in limited circumstances. *See* 42 U.S.C. § 1320a-7a(i)(6)(A). And it is equally true that such waivers, if used to induce payments from federal healthcare programs, can give rise to liability under the FCA. But the FCA does not impose liability for preparations for fraud, it penalizes the actual submission of false claims. *See Clausen*, 290 F.3d at 1312 n.21.

The relators do not identify any specific claim submitted to Tricare in connection with a co-pay waiver. They identify no patient whose co-pay was improperly waived and for whom reimbursement was sought. Nor do they allege any direct knowledge of billing activity or access to claims data. At most, they describe a policy; they do not describe a fraud.

Still, the relators suggest that pleading "reliable indicia" that there was a scheme to submit false claims excuses them from pleading claims that were actually submitted to the government.

Not so. However styled, "the true essence of the fraud of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme." *Clausen*, 290 F.3d at 1312 n.21 (internal quotation marks omitted). As we have explained, Rule 9(b)

> does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Id.* at 1311.

The inferential leap the relators urge us to condone is precisely what we have rejected in previous cases. *See, e.g.*, *Atkins*, 470 F.3d at 1359 (finding a complaint deficient where a relator alleged improper practices and asked the court to infer that false claims must have been submitted). The same reasoning applies here. The District Court correctly dismissed this theory.

### C.     The Auto-Ship Scheme

The relators next allege that Optigen automatically shipped CPAP replacement supplies to patients who had not requested them. Certainly, Tricare covers certain replacement items. But it covers them only when medically necessary. According to the relators, Optigen bypassed that requirement by setting up recurring shipments and pressuring employees to meet monthly reorder targets. The result, they claim, was a glut of unwanted equipment and a stream of improper claims.

But again, the complaint identifies no specific false claim submitted to the government. The relators provide no claim numbers, no billing codes, no dates, and no reimbursement amounts to satisfy Rule 9(b)'s requirements.[5] *See Hopper*, 558 F.3d at 1324. They do not reliably assert that they had access to Optigen's billing systems or personal involvement in the claims submission process for these supplies. Instead, relator Vargas states only that he was in a "perfect position" to know about the shipping practices—and from that, the relators ask us to infer that fraudulent claims must have followed.

That is not enough. As with the co-pay theory, the relators must allege facts that show that Optigen actually submitted false claims to the government. Their allegations do not meet that standard. The District Court properly dismissed this theory.

### D.    *The Kickback Scheme*

The relators' final theory rests on the Anti-Kickback Statute, which prohibits offering or paying remuneration to induce referrals for federally reimbursable healthcare services. 42 U.S.C. § 1320a-7b(b)(2). They allege that Optigen violated this statute by paying setup fees and other perks to CFTs, who acted as independent contractors for Optigen and allegedly worked with sleep clinicians who prescribed CPAP machines. According to the com-

---

[5] To be clear, we do not suggest these are required elements of the relators' claim. They are, rather, "some types of information that might have helped [the relators] state an essential element of [their] claim with particularity." *See Clausen*, 290 F.3d at 1312 n.21.

plaint, these CFTs received between $50 and $225 per setup, with higher-volume CFTs—those who supposedly generated more referrals—receiving higher payments. Some CFTs also got extras like warehouse stipends, phone reimbursements, and occasional meals.

But the relators fail to tie the CFTs' payments to any actual referrals. They identify no patient referred by a CFT, no instance in which a CFT influenced a prescribing decision, and no facts showing that CFTs played any role in the referral process (whatever that may be). They point to CFTs who purportedly received high fees and made many referrals, but they offer no detail—no conversations, no meetings, no influence over any prescriber's decision.[6]

Instead, what the complaint does show is that Optigen paid CFTs to do a legitimate job: set up CPAP equipment in patients' homes. That work likely included travel, equipment setup, training, and follow-up support. Merely paying people for doing that work—even if the rates vary—does not violate the law.

The upshot is that the relators never pleaded how CFTs induced referrals or why the compensation—paid for services ren-

---

[6] In their briefs and again at oral argument, the relators recited the conclusory refrain that they alleged the payments were made—"in part"—to induce referrals. Such a barebones assertion scarcely warrants mention, except to repeat what we have said many times: under Rule 9(b), that is not enough.

dered—should be viewed as anything other than payment for work done. And without facts bridging payment and referral, the complaint fails to sufficiently plead a kickback scheme. The District Court correctly dismissed this claim.

### III.    Conclusion

The relators pleaded one claim under the FCA, but they pursued four distinct theories of liability. Only one of those theories—the alleged upcoding of CPAP batteries and accessories as ventilator batteries and accessories—satisfies Rule 9(b)'s heightened pleading standard. The others fall short. The allegations regarding co-pay waivers, automatic shipments of accessories, and kickbacks are too speculative, too general, or too disconnected from any actual claim for payment.

We therefore affirm the District Court's dismissal of the relators' FCA claim to the extent it rests on those deficient theories. But we reverse the dismissal as to the upcoding theory and remand for further proceedings limited to that issue.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

24-11080                Tjoflat, J., Concurring                1

TJOFLAT, Circuit Judge, concurring:

I write separately to flag a foundational pleading defect that the District Court did not reach. The relators' fourth amended complaint—the fifth complaint filed in this case—asserts just one count under the FCA. But packed into that single count are four distinct fraud claims: (1) misclassifying CPAP batteries as ventilator equipment, (2) routinely waiving patient co-pays, (3) autoshipping CPAP supplies without patient requests, and (4) paying kickbacks to referring technicians. These are separate allegations, involving different conduct, different facts, and different legal theories. Yet the relators lump them together in one catch-all count, forcing the District Court—and now us—to sort them out. That is not how litigation works. *See* Fed. R. Civ. P. 10(b) ("[E]ach claim founded on a separate transaction or occurrence . . . must be stated in a separate count.").

The fourth amended complaint is a shotgun pleading—something we have condemned time and again. It "lumps multiple claims together in one count" and forces courts to play detective rather than umpire. *See Ledford v. Peeples*, 657 F.3d 1222, 1239 (11th Cir. 2011). Shotgun pleadings are not tolerated because they run counter to the purpose of the Federal Rules of Civil Procedure:

> The purpose of these rules is self-evident, to require the pleader to present his claims discretely and succinctly, so that, [a plaintiff's] adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which

claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not. "Shotgun" pleadings, calculated to confuse the "enemy," and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the [spirit], if not the [letter], of these rules.

*T.D.S. Inc. v. Shelby Mut. Ins.*, 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting); *accord Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

Separating claims into different counts allows courts to test each claim on the pleadings, strike the deficient ones, and let the rest proceed. Plaintiffs who refuse to do that usually have a reason. As we have explained, shotgun pleadings are often calculated "to extort the settlement of a meritorious claim . . . and to extort the settlement of unmeritorious claims." *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001). And that is the case here. The relators pack four claims into one count, but only one claim is pleaded sufficiently. Yet the relators made it virtually impossible to dismiss, amend, or try one claim without entangling the others.

The costs of this tactic are real. First, it burdens courts, which must untangle the claims just to figure out what is at issue. Second, it burdens defendants, who must guess at what they should defend against. Third, it burdens the appellate process, where we are asked to review a complaint the plaintiffs never

24-11080                Tjoflat, J., Concurring                3

bothered to clarify. In sum, shotgun pleadings reward imprecision and strategic vagueness. They flout the basic demands of Rules 8 and 10.

So what is a district court—or a defendant—to do? A defendant confronted with a shotgun complaint should move under Rule 12(e) for a more definite statement. *See* Fed. R. Civ. P. 12(e) ("A party may move for a more definite statement . . . if the pleading is so vague or ambiguous that the party cannot reasonably prepare a response."); *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) ("Where, as here, the plaintiff asserts multiple claims for relief, a more definite statement, if properly drawn, will present each claim for relief in a separate count, as required by Rule 10(b).").

And a district court confronted with a shotgun complaint should sua sponte strike it—early and firmly. We have said it before, and we will say it again: shotgun pleadings harm courts "by impeding [their] ability to administer justice." *Byrne*, 261 F.3d at 1131. Striking shotgun complaints at the outset spares everyone wasted time, money, and motion practice. *See, e.g.*, *Anderson*, 77 F.3d at 366–67 ("[W]ith the shotgun pleading out of the way, the trial judge will be relieved of 'the cumbersome task of sifting through myriad claims, many of which [may be] foreclosed by [various] defenses.'" (quoting *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984))).