UNITED STATES of America EX REL. Beatriz AQUINO, Plaintiff,

v.

UNIVERSITY OF MIAMI, et al., Defendants.

Case No. 14–20372–CIV–WILLIAMS

United States District Court, S.D. Florida.

signed 04/26/2017

Jessica Elise Elliott, United States Attorney's Office Southern District of Florida, Miami, FL, for Plaintiff.

Eric David Isicoff, Teresa Ragatz, Christopher Michael Yannuzzi, Isicoff, Ragatz & Koenigsberg, Miami, FL, for Defendant.

## ORDER

KATHLEEN M. WILLIAMS,
UNITED STATES DISTRICT JUDGE

**THIS MATTER** is before the Court on Defendants University of Miami ("UM") and Dr. Nestor De La Cruz–Muñoz's ("De La Cruz") motion to dismiss amended complaint. (DE 49). Relator Beatriz Aquino obtained the Court's leave to file an untimely response to the motion to dismiss. (DE 52). Defendants then filed a reply in support of the motion. (DE 58). For the reasons below, the motion (DE 49) is **GRANTED IN PART AND DENIED IN PART.** This matter proceeds only as to the allegations against UM in Count 3 of the First Amended Qui Tarn Complaint ("FAC").

## I. BACKGROUND

### A. Facts [1]

■ This case is about De La Cruz and UM's allegedly fraudulent surgical billing

---

1. At this stage of the litigation, the Court takes the FAC's non-conclusory factual allega-

practices and the actions that they took when Aquino relayed her concerns about these practices to them. Aquino worked at the UM Miller School of Medicine from "late 1998 to late 2000 and again from mid–2001 until her termination on February 6, 2012." (DE 48 ¶ 16). Before 2010, Aquino was a Patient Access Coordinator and a Senior Surgical Coordinator with the UM Miller School of Medicine Department of Surgery. (DE 48 ¶¶ 17–18). Her "[i]nitial/[p]re-surgical" duties in these two roles included intake, presentations to patients about procedures and costs, coordination and verification of patient insurance and payment, and review of the "Super–Bill" or medical bill code face-sheet prepared by the physician. (DE 48 ¶ 21). Aquino's "[p]ost-[s]urgical" duties included review of the operative report, update of patient charts, coordination of post-operative care, follow-up on billing authorization issues, and review and verification of the Super–Bill—which was subsequently provided to the billing department at the UM Miller School of Medicine for submission of claims for payment. (DE 48 ¶ 22). Notably, Aquino did not oversee the submission of claims to or receipt of payments from programs such as Medicare,[2] but instead submitted a "Super–Bill to the ... billing department for submission" to such programs. (DE 48 ¶ 21, 22).

Starting in January 2010 until her termination on February 6, 2012, Aquino was the Senior Access Supervisor at a satellite office in Doral, Florida affiliated with the UM Miller School of Medicine Division of Laparoendoscopic and Bariatric Surgery. (DE 48 ¶¶ 26–27). De La Cruz, who was the recently-hired Chief of the Division,

was Aquino's supervisor. (DE 48 ¶ 26). As Senior Access Supervisor, Aquino "performed, and supervised other employees' performance of, the same functions [she] performed with the Department of Surgery" in her roles as Patient Access Coordinator and Senior Surgical Coordinator, "including extensive patient contact." (DE 48 ¶ 28). "The only exception is that she did not have to review the Super–Bills, as the patient records and billing system ... were being transitioned to a new electronic system referred to as 'UChart.'" (DE 48 ¶ 28). The FAC does not specify what, if any, responsibilities that Aquino had pertaining to UChart. Aquino also took on several new responsibilities in her role under De La Cruz:

> manage the office and an office staff of five (5) to eight (8) ... employees; discuss clinical goals, operations, and practices with [De La Cruz] and other [UM Miller School of Medicine] executives; hold office staff meetings to discuss said goals, operations, and practices; handling certain billing-related and coding issues as they arose; ... increase the caseload of potential surgical candidates for [the UM Miller School of Medicine] and [De La Cruz]; access and review patient records, medical histories, insurance information, and billing information; and interact with patients and potential patients as needed.

(DE 48 ¶ 29).

Aquino claims that De La Cruz's office operated differently from the UM offices in which she previously worked in that De La Cruz's office "physically sought and collected funds from the patients for co-

---

tions as true pursuant to Federal Rule of Civil Procedure 12(b)(6) and construes the facts in the light most favorable to Aquino. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

2. "The Medicare Program is a system of health insurance administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services (CMS)." *United States ex rel. Walker v. R & F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1351 (11th Cir. 2005).

payments and deductibles, for self-pay patients, and for the payment of surgical fees (usually $2,500.00) from Medicare patients for [De La Cruz]." (DE 48 ¶ 30). She alleges that she was required as part of her duties as Senior Access Supervisor to "collect and supervise the collection by staff of . . . patient monies and to deposit same in a bank account maintained" by De La Cruz and the UM Miller School of Medicine. (DE 48 ¶ 31). Aquino also alleges that separate from her work duties as a Senior Access Supervisor and outside of her regular work hours, De La Cruz—in his personal capacity—employed her to perform unspecified custodial and clerical functions. (DE 48 ¶ 33).

While working for De La Cruz as Senior Access Supervisor, Aquino came to believe that De La Cruz and UM were engaged in two fraudulent billing practices. First, she claims that UM billed Medicare for Vertical Sleeve Gastronomy ("VSG") surgical weight loss procedures that De La Cruz performed—which Medicare did not cover at the time—by falsely claiming that De La Cruz had actually performed some other covered surgical weight loss procedure, such as a Laparoscopic Adjustable Gastric Banding ("LAGB") or a Roux–en–Y Gastric Bypass ("RYGBP"). (DE 48 ¶¶ 34–39). Second, she states that De La Cruz "altered and/or instructed" Aquino and other subordinates to "change otherwise accurate data on patient records, usually weight or height, to falsely attain a [Body Mass Index] that met the minimum criteria for payment by Medicare." (DE 48 ¶ 48). The purpose of these alterations, according to Aquino, was to "satisfy the minimum criteria for covered surgical procedures, irrespective of whether the actual procedure was in fact and in law covered by Medicare." (DE 48 ¶ 51). Relatedly, Aquino asserts that as part of De La Cruz's preliminary medical work-up for surgical candidates, "the diagnoses of certain patients . . . were specifically, knowingly, and intentionally altered when necessary to qualify the patient for surgery and/or to seek approval for Medicare payment of the surgery." (DE 48 ¶¶ 52–53).

Aquino's claims stem from various observations she made during her time working for De La Cruz. Regarding the first alleged fraud, at an unspecified time during Aquino's tenure as Senior Access Supervisor, she and her subordinates began fielding complaints about the $2,500 "surgical fee" that De La Cruz charged Medicare patients for the VSG procedure, which De La Cruz held Aquino "personally responsible" for collecting and depositing into a bank account. (DE 48 ¶¶ 30–31, 55–57). De La Cruz instructed Aquino and other staff to tell patients charged the $2,500 fee that "Medicare would pay everything other than the surgeon's fee for the [VSG] procedure." (DE 48 ¶ 58). Aquino, however, independently knew that Medicare did not cover VSG. (DE 48 ¶ 59). She also believed that the VSG procedure cost much more than $2,500 because De La Cruz had separately instructed her to quote a price of $18,500 with a $5,500 surgical fee for uninsured patients seeking VSG. (DE 48 ¶¶ 59–60, 64).

As to her claims that De La Cruz fraudulently altered patient data, Aquino alleges that while employed by De La Cruz, he "altered and/or instructed his office personnel to change otherwise accurate data on patient records" and that "[s]ome of these requests . . . were made to and/or in the presence of [Aquino]." (DE 48 ¶¶ 48). The FAC references, in relation to these allegations, "[o]ne patient . . . identifiable by [Aquino]" with the initials A.N., although the FAC provides no additional details about who A.N. was, what specific alterations were made to A.N.'s records, when and how these alterations were made, how these alterations related to any claims for payment on A.N.'s behalf—or

even whether any such claims for payment were actually submitted. (DE 48 ¶ 50). Aquino explains that she cannot make more specific allegations because the inculpatory evidence is in Defendants' sole possession. (DE 50 ¶ 49, 54).

In late 2011, Aquino decided to complain about the legality of the $2,500 surgical fee to Lilliam Dana, an administrator at the UM Miller School of Medicine. (DE 48 ¶ 61). Aquino also "repeatedly and insistently raised the same legality concerns" about the fee with De La Cruz, and inquired with De La Cruz how UM Hospital—the entity which administered UM-affiliated hospitals—and other providers at the UM Miller School of Medicine were paid for services they provided in connection with the VSG surgeries he performed. (DE 48 ¶¶ 62–63). De La Cruz responded that the $2,500 fee was "his fee for the surgery" and that he was displeased with Aquino for asking questions. (DE 48 ¶¶ 62, 65). Aquino also "raised concerns" at an unspecified time to unspecified individuals "regarding the inclusion of altered or inaccurate information maintained in the patient files" (DE 48 ¶ 67) and complained to De La Cruz about "potential [Health Insurance Portability and Accountability Act] issues," "the accuracy of the medical record information," and "his operation in the Doral office" (DE 48 ¶ 68), but was met with similarly dismissive responses (DE 48 ¶ 69).

After she started complaining in late 2011, Aquino noticed that her interactions with De La Cruz "began to change" as he "began to contrive and manufacture issues in the office for which to find Aquino accountable, which had not been issues in the past." (DE 48 ¶ 70). De La Cruz also "began to limit his interactions and communications with Aquino" and "discontinued employing [Aquino] to provide the custodial and miscellaneous clerical work after hours." (DE 48 ¶¶ 71–72). Finally, he "fabricated allegations that [Aquino] stole supplements he sold to bariatric patients and alleged that $400.00 was missing from [Aquino's] desk." (DE 48 ¶ 73). On February 6, 2012, Aquino received a telephone call from Roberto Estrada, an assistant to Rafic Warwar, who is "second in charge" of the UM Miller School of Medicine Department of Surgery, advising that she was scheduled to meet with Warwar the following morning. (DE 48 ¶ 74). When she arrived for the Warwar meeting, Aquino was instead escorted to UM's security department and accused by a UM security official of stealing $400 and supplements from De La Cruz's office. (DE 48 ¶ 75). Aquino denied the allegations and stated alternative theories for why $400 went missing from her desk. (DE 48 ¶¶ 76–77, 81). The security official told her that a thorough investigation would reveal the reason for the missing funds and Aquino then agreed to replace the funds with her own money "for the sole purpose to avoid losing her job as directed by the security employee." (DE 48 ¶ 80–81).

Later the same day, De La Cruz accused Aquino and her husband of stealing the $400 and supplements from his office and "falsely claim[ed] to have a video showing both doing such." (DE 48 ¶ 82). When Aquino challenged De La Cruz to produce the video, he could not do so. (DE 48 ¶ 83). Nevertheless, Aquino was not allowed to return to work and received an official letter of termination on February 14, 2012 which made her termination effective as of February 6. (DE 48 ¶¶ 84, 86). She later learned that UM had not conducted the investigation that the security official had promised. (DE 48 ¶ 85). In light of these facts, Aquino alleges that De la Cruz "contrived the circumstances in order to terminate [her] because of her continuously raising concerns and issues ... and for complaining of his illegal practices and procedures." (DE 48 ¶ 88). The

FAC also acknowledges that Aquino was later "forced to defend ... contrived criminal charged against her and settle same" and "was forced to challenge" Defendants' "false assertions before the State of Florida in order to receive unemployment compensation after her termination, which she was ultimately awarded." (DE 48 ¶ 90).

Aquino brings two substantive causes of action against both Defendants pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1): (1) submitting false claims to Medicare for covered services not actually rendered to patients in order to obtain compensation for uncovered VSG procedures; and (2) submitting false claims to Medicare on behalf of non–eligible patients by improperly altering patient data. Aquino separately alleges a third cause of action against both UM and De La Cruz for retaliatory discharge in violation of the FCA, 31 U.S.C. § 3730(h)(1).

### B. Procedural History

Aquino filed her original *qui tam* Complaint on January 30, 2014 under seal as required by 31 U.S.C. § 3730(b)(2). (DE 1). On August 13, 2015, the government filed a notice stating that it declined to intervene in this action. (DE 23). Accordingly, the Court unsealed the relevant portions of this action (DE 24) and set a status conference for November 23, 2015 (DE 31). Before the status conference, Defendants filed a motion to dismiss the Complaint premised on the argument that Aquino's Complaint did not satisfy the pleading requirements of the Federal Rules of Civil Procedure as they pertain to alleged FCA violations. (DE 36). At the status conference, the Court granted the motion to dismiss and ordered Aquino to file a "final amended complaint" that met the pleading standards applicable to FCA claims. (DE 39). Aquino filed the FAC on January 25, 2016. (DE 48). Defendants then timely filed the motion to dismiss now before the Court. (DE 49). When Aquino failed to respond to the motion to dismiss within the time required by the Local Rules of the Southern District of Florida, the Court entered an order to show cause. (DE 50). Aquino then obtained leave of the Court and on April 14, 2016, submitted an untimely response to the motion to dismiss. (DE 52). Defendants filed a reply in support of their motion to dismiss (DE 58).

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court's consideration is limited to the allegations presented. *See GSW, Inc. v. Long Cty.,* 999 F.2d 1508, 1510 (11th Cir. 1993). All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention,* 623 F.3d 1371, 1379 (11th Cir. 2010); *see also Roberts v. Fla. Power & Light Co.,* 146 F.3d 1305, 1307 (11th Cir. 1998). Nevertheless, while a plaintiff need not provide "detailed factual allegations," the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal citations and quotations omitted). "Additionally, 'conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.'" *United States ex rel. Keeler v. Eisai, Inc.,* 568 Fed.Appx. 783, 792–93 (11th Cir. 2014) *(quoting Davila v. Delta Air Lines, Inc.,* 326 F.3d 1183, 1185 (11th Cir. 2003)). The "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir.

2007) (quoting *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955).

In addition to the requirements of *Twombly, Iqbal,* and Federal Rules of Civil Procedure 8(a) and 12(b)(6), claims asserted under the False Claims Act (as well as other fraud claims) are subject to the pleading standards of Federal Rule of Civil Procedure 9(b). *See United States ex. rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1309–10 (11th Cir. 2002); *Keeler,* 568 Fed.Appx. at 802–03. That rule provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." Fed. R. Civ. P. 9(b). Rule 9(b) is satisfied if the plaintiff pleads "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997)).

In the context of the FCA, the complaint must set forth "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen,* 290 F.3d at 1308 (internal quotation marks and citation omitted); *accord. United States ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1302 (11th Cir. 2010); *United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.,* Case No. 1:11-CV-00962-WSD, 2012 WL 8020674, at *5 (N.D.

Ga. 2012) (citing *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir. 2006) (requiring relators to detail "the who, what, when, where, and how" of their claims)). "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 232 (1st Cir. 2004).

Whether submission of the claims or payment by the government are sufficiently established are different questions than whether the scheme has been sufficiently pled. *See Keeler,* 568 Fed.Appx. at 798 (citing *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005)); *see also Britton v. Lincare, Inc.,* Case No. 2:13-cv-00742-SGC, 2015 WL 1487134, at *4 (N.D. Ala. March 30, 2015) ("[T]he relevant inquiry for purposes of determining whether a complaint has pled the actual submission of a claim sufficiently is whether the relator purports to have direct, first-hand knowledge of the defendant's *billing practices*") (emphasis in original). As discussed below, the Eleventh Circuit has recognized that while the requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent "[s]peculative suits against innocent actors for fraud" and charges of guilt by association. *Clausen,* 290 F.3d at 1308 (quoting *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.,* 19 F.3d 562, 566–67 (11th Cir. 1994) (per curiam)).

## III. DISCUSSION

The FCA "was enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." *Vt. Agency of Nat. Res. v. United States ex rel. Ste-*

*vens,* 529 U.S. 765, 781, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (quotations omitted); *see also Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1236 n.1 (11th Cir. 1999) ("The purpose of the Act, then and now, is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward."). Private persons may bring civil actions to enforce the FCA. 31 U.S.C. § 3730(b)(1). Pursuant to the FCA, Aquino brings two substantive causes of action, Counts 1 and 2, and a retaliatory discharge cause of action, Count 3. The Court discusses the substantive counts and the retaliatory discharge count separately below.

## A. Substantive Counts

Counts 1 and 2 of the FAC allege that Defendants violated the "false claim" and "make or use" provisions of the FCA by (1) billing for covered services not performed and (2) billing for non-eligible Medicare patients using altered patient data. Neither of these counts survive Rule 12(b)(6) scrutiny.

The FCA's "false claim" provision imposes liability on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[.]" 31 U.S.C. § 3729(a)(1)(A). The "make or use" provision imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). In the context of these FCA provisions, "knowingly" means the person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1). The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property that is pre-

sented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2).

With regard to causes of action brought pursuant to the FCA's "false claim" and "make or use" provisions, Federal Rule of Civil Procedure 9(b) requires that the plaintiff allege the scheme underlying both the "false claim" and the "make or use" violation with particularity. *See Keeler,* 568 Fed.Appx. at 798 (citing *Corsello,* 428 F.3d at 1014); *see also Hopper v. Solvay Pharms., Inc.,* 588 F.3d 1318, 1328 (11th Cir. 2009) (A violation of the "make or use" provision requires relators to "allege with particularity, pursuant to Rule 9(b), that [the defendant's] false statements ultimately led the government to pay amounts it did not owe."); *United States ex rel. Klusmeier v. Bell Constructors, Inc.,* 469 Fed.Appx. 718, 721 n.5 (11th Cir. 2012) ("Because Relators failed to establish a false or fraudulent claim or statement, which is a requirement of both [a "false claim"] and [a "make or use" violation], Relators have failed to properly plead both their FCA claims and we address them together."). Separately, to state a "false claim" under § 3729(a)(1)(A), the plaintiff must also demonstrate that the complaint contains sufficient "indicia of reliability ... to support the allegation of an *actual false claim* for payment being made to the Government." *Clausen,* 290 F.3d at 1311 (emphasis in original). And to state a "make or use" violation under § 3729(a)(1)(B), the plaintiff must demonstrate that "(1) the defendants made a false record or statement for the purpose

of getting a false claim paid or approved by the government; and (2) the defendants' false record or statement caused the government to actually pay a false claim[.]" *Hopper*, 588 F.3d at 1327.

■■■ The particularized allegation that the defendants actually submitted a false claim, and by extension that the government actually paid, is at the heart of an FCA violation:

> The submission of a [false] claim is ... not ... a "ministerial act," but the *sine qua non* of a False Claims Act violation. As such, Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Clausen*, 290 F.3d at 1311; *accord. Corsello*, 428 F.3d at 1014 ("In short, Corsello provided the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices, but he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of the fraudulent submissions to the government"); *Keeler*, 568 Fed.Appx. at 798; *Britton*, 2015 WL 1487134, at *4. Conclusory allegations about the ultimate submission of false claims without "indicia of reliability ... in the complaint to support the allegation of *an actual false claim* for payment" do not meet the Rule 9(b) standard. *Clausen*, 290 F.3d at 1311 (emphasis in original).

■■■ Strict enforcement of this rule is rooted in the fact that "[l]iability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Corsello*, 428 F.3d at 1012 (citation omitted); *Urquilla–Diaz v.*

*Kaplan University*, 780 F.3d 1039, 1045, 1051–52 (11th Cir. 2015) (quoting *Corsello*, 428 F.3d at 1012); *Jallali v. Nova Se. Univ., Inc.*, 486 Fed.Appx. 765, 766 (11th Cir. 2012). Accordingly, "[t]he False Claims Act does not create liability merely for a health care provider's ... improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311; *see also Universal Health Servs., Inc. v. United States*, —— U.S. ——, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016) ("The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal quotation marks and citation omitted). That is, a relator must show that the defendant actually submitted claims and that there was a nexus between the alleged improper practices and the submission of those claims. *See Clausen*, 290 F.3d at 1311; *Klusmeier*, 469 Fed.Appx. at 721 (citing *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006)).

■■■ Defendants' motion to dismiss contends that, pursuant to these standards, Aquino's FAC fails to state a claim as to Counts 1 and 2. The Court agrees. Although the FAC details questionable internal procedures at the satellite office in Doral, it does not allege with any particularity even one claim for payment to Medicare or any other government program. Lacking details about the "who, what, when, where, and how," of a single actual false claim, the FAC fails to allege the *sine qua non* of an FCA violation. *See Clausen*, 290 F.3d at 1312 n.21 (holding that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)"); *Corsello*, 428 F.3d at 1014 ("In short, Corsello provided the 'who,' 'what,' 'where,' 'when,' and 'how' of im-

proper practices, but he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of the fraudulent submissions to the government"); *Hopper*, 588 F.3d at 1328 (holding that "improper practices standing alone are insufficient to state a claim" under either the "false claim" or the "make or use" provisions of the FCA "absent allegations that a specific fraudulent claim was in fact submitted to the government"); *Keeler*, 568 Fed.Appx. at 798 ("Relator never discusses or proffers a single false claim that was made to the government in the detail required by *Clausen*, nor has he submitted a copy of such a bill or payment. Instead, he proffers only conclusory assertions based on his own speculation that claims were submitted."); *Britton*, 2015 WL 1487134, at *4 (granting motion to dismiss where relator did not "provide a sample claim or any billing data[,] ... specify when any of the conduct ... occurred[,] ... [or] allege he ever worked in [the defendant's] billing department or otherwise has first-hand knowledge of ... billing practices or the actual submission of a false or fraudulent claim."). Dismissal of such nonspecific allegations of fraud is appropriate because Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Id.* at 1310 (quoting *Ziemba*, 256 F.3d at 1202).

Aquino responds that the FAC sufficiently describes the "who, what, where, when, how" needed to survive Defendants' motion to dismiss: De La Cruz and UM submitted false claims by miscoding VSG surgeries and by altering records and diagnoses of patients, at the satellite office in Doral; from June 2010 through February 2012, using the "UChart" electronic system. (DE 52 at 8). This response, however, only highlights the FAC's fatal flaw: there are no allegations about the submission of even one "claim" tied to a particular patient, a particular surgery, a particular record entry, or a particular time and date.[3] Indeed, the FAC does not allege a specific instance in which De La Cruz performed uncovered VSG surgery, falsely recorded the surgery as some other procedure (e.g., LAGB or RYGBP) that Medicare covered, and forwarded those records to the UM Miller School of Medicine's billing department, which then submitted a false claim to Medicare based on those records and received payment for that false claim. Likewise, the FAC does not allege a specific instance in which De La Cruz fraudulently altered or instructed his staff to alter a patient's records to meet minimum Medicare eligibility thresholds, and forwarded those records to the UM Miller School of Medicine's billing department, which then submitted a false claim to Medicare based on those records and received payment for that false claim.

 In an attempt to rehabilitate the FAC's sufficiency in this regard, Aquino's brief in response to the motion to dismiss makes extensive new allegations not set forth in the FAC. For instance, Aquino explains in her brief that UM's electronic "UChart" billing system was the mechanism by which De La Cruz "required the staff ... to alter [patients'] height and weight to secure a qualifying BMI" and

---

3. The closest the FAC comes to alleging a particularized false claim is the allegation that "[o]ne patient specific[ally] ... identifiable by [Aquino] has the initials A.N." (DE 48 ¶ 50). The FAC represents that A.N.'s "full name is omitted ... for privacy reasons and will be provided by other means to the Defendants and to the Court under seal" (DE 48 ¶ 50), but Aquino has not since provided any additional information about A.N. in the record or to the Court. In any event, the FAC does not allege the submission of a false claim on A.N.'s behalf, let alone the "who," "what," "when," and "how" of such a submission.

that De La Cruz "would input fraudulent results into UChart's medical records" and "falsely and fraudulently used a covered code in UChart to secure Medicare coverage" for uncovered VSG procedures. (DE 52 at 8). According to Aquino, these details somehow follow from the FAC's unrelated observation that the patient records and billing systems at UM Miller School of Medicine "were being transitioned to a new electronic system referred to as 'UChart.'" (DE 48 ¶ 28). The FAC's allegations are much more sparse—and support many fewer reasonable inferences—than Aquino's responsive brief suggests.[4]

The Court's review of the FAC reveals only three factual allegations related to Aquino's involvement with UM's billing system: (1) before Aquino worked for De La Cruz, she regularly processed the "Super–Bill" and sent it to the UM Miller School of Medicine billing department for submission to the relevant insurer (DE 48 ¶¶ 21, 22); (2) after she started working for De La Cruz, she "did not have to review the Super–Bills, as the patient records and billing system[s] ... were being transitioned" to UChart (DE 48 ¶ 28); and (3) while working for De La Cruz, she "handl[ed] certain billing-related and coding issues as they arose" and "access[ed] and review[ed] patient records, medical histories, insurance information, and billing information." (DE 48 ¶ 29). Even in the light most favorable to Aquino, these three allegations at most establish that Aquino had some exposure to De La Cruz's bill coding information before a separate department at UM actually submitted claims for payment. They do not support an inference that Aquino had firsthand knowledge of actual submissions of false claims for payment.[5]

Despite the absence of any particularized allegations about the submission of false claims, Aquino maintains that "her person[al] attestation of fraudulent submissions as a member of management, combined with the who, what, where, when, and how alleged in the amended complaint [are] sufficient." (DE 52 at 12). For this argument, she relies primarily on

4. For purposes of deciding this motion, the Court declines to consider any such allegations contained in Aquino's response to the motion to dismiss but extrinsic to the FAC. *See Financial Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). These extrinsic allegations are not limited to Aquino's claims about UChart; they also include the new allegation that Aquino "personally witnessed [De La Cruz] create false medical records to secure Medicare payment for otherwise non-covered individuals and surgeries." (DE 52 at 9). The FAC alleges only that De La Cruz, in Aquino's presence, directed "office personnel to change otherwise accurate data" in unspecified "patient records, usually weight or height"—which the FAC speculates without any factual basis was "to falsely attain a BMI index that met the minimum criteria for payment by Medicare." (DE 48 ¶ 48). Moreover, even if Aquino's extrinsic allegations are assumed true, they do not overcome the fact that Aquino nowhere credibly alleges the requisite submission of an actual false claim for payment.

5. Various allegations in the FAC appear to contradict the notion that Aquino had direct knowledge that Defendants submitted false claims for payment to the government. The FAC's convoluted narrative of how Aquino became aware of the alleged scheme—based on her knowledge that VSG was not covered by Medicare and her observation of a discrepancy between the $2,500 surgical fee that De La Cruz collected from VSG patients insured by Medicare and the $18,500 figure that he wanted quoted to uninsured patients—suggests that she deduced, from a few discrete data points she had, that Defendants must have been submitting false claims. Likewise, the fact that Aquino complained to superiors about internal office practices and not about fraudulent claims, and that she inquired of De La Cruz "how the hospital and the other [UM Miller School of Medicine] providers rendering in-hospital services were paid," (DE 48 ¶ 63), indicates, at most, a generalized suspicion that Defendants were submitting false claims, not firsthand knowledge of submission of particular false claims.

*United States ex rel. Walker v. R & F Properties of Lake County*, 433 F.3d 1349 (11th Cir. 2005), in which the Eleventh Circuit affirmed the district court's denial of a motion to dismiss FCA claims. Pointing to several other Eleventh Circuit cases, Aquino also argues that *qui tam* claims brought by relators involved in "management and decision-making" regularly survive motions to dismiss without meeting the Rule 9(b) pleading standard. (DE 52 at 10–11); *see also United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed.Appx. 693, 708 (11th Cir. 2014); *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217 (11th Cir. 2012); *Hill v. Morehouse Medical Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *5 (11th Cir. 2003). Aquino is correct that the Eleventh Circuit in *Walker*, *Mastej*, and similar cases has allowed FCA claims to proceed where clear "indicia of reliability" support the actual submission of a false claim, even if the relator cannot offer particularized allegations about a specific false claim. But these cases also establish a relatively high bar for "indicia of reliability" that this case does not clear.

Illustrating this point, the relator in *Mastej* was a 30-year healthcare industry veteran who had been the vice president of acquisitions and development at a hospital administrator called HMA. *Mastej*, 591 Fed.Appx. at 695–96. Then, after leaving his position at HMA, the relator worked as CEO of one of two hospitals run by one of HMA's subsidiary companies. *Id.* at 696. Based on knowledge he acquired in these positions, the relator sued both HMA and its subsidiary, alleging that the hospitals run by the subsidiary were paying kickbacks to neurosurgeons for patient referrals. *Id.* at 699. The hospitals masked the kickbacks by characterizing them as payments to the neurosurgeons for being on call to perform "emergency or un-planned neurosurgery services" that neither hospi-

tal offered. *Id.* The relator also alleged that both defendants "flew several Naples, Florida doctors—at the Defendants' expense and on [HMA's] corporate jet—to an April 2008 golf tournament" as a kickback for patient referrals. *Id.* at 699–700. Although the relators alleged these schemes in detail, "his allegations about the . . . Medicare claims for referred patients [were] generalized and mostly conclusory." *Id.* at 701. The district court in *Mastej* granted the defendants' motion to dismiss all three FCA counts, but the Eleventh Circuit reversed and remanded as to two counts, reasoning that a "relator can also provide the required indicia of reliability" called for by *Clausen's* interpretation of Rule 9(b) by "showing that he was personally in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *Id.* at 707 (citing *United States ex rel. Walker v. R & F Properties of Lake Cty.*, 433 F.3d 1349, 1360 (11th Cir. 2005); *Hopper*, 588 F.3d at 1326). It should be noted that the relator in *Mastej* acquired this qualifying personal knowledge of actual false claims by "attend[ing] case management meetings" as vice president of HMA, during which "every patient was reviewed, including how the services were being billed to each patient." *Mastej*, 591 Fed.Appx. at 707. He was also "intimately familiar with the payor mix at the hospitals, including the Medicare billing and payments at the hospitals[.]" *Id.* (internal quotation marks omitted). And he knew the names of each of the doctors making illegal referrals and was "familiar with the Defendants' Medicare patients, services and, importantly, revenues." *Id.* at 708.

The factual basis in *Mastej* for the relator's personal knowledge that the defendant had actually submitted false claims far surpasses anything Aquino offers here. Aquino alleges that she was a Patient Ac-

cess Coordinator, Senior Surgical Coordinator, and Senior Access Coordinator at UM for almost 13 years, and worked for De La Cruz as a Senior Access Coordinator for just over two years. In these roles, she had access to and kept doctors' and patients' records that were eventually forwarded to the UM Miller School of Medicine billing department for claims submission. She also observed what she deemed to be several questionable procedures that De La Cruz implemented. Critically though, Aquino did not have any duties which gave her knowledge of or participation in Defendants' actual submission of Medicare claims or receipt of Medicare payments. This distinguishes *Mastej*, where the relator sat in on meetings where he reviewed records of actual claims to and receipt of payments from Medicare. Further, the *Mastej* relator held two executive positions that gave him knowledge of the revenues the defendant obtained from Medicare. In contrast, the FAC fails to allege that Aquino obtained any knowledge about the UM Miller School of Medicine billing department's interactions with Medicare or total revenues UM or De La Cruz obtained from Medicare. Without such knowledge, her allegations lack the "indicia of reliability" needed to overcome the FAC's Rule 9(b) deficiencies.[6]

Aquino's case is similarly distinguishable from *Walker*. There, the relator—a nurse practitioner formerly employed by the defendants in a small medical clinic-described a scheme to overbill Medicare for services performed exclusively by her, other nurse practitioners, and physicians' assistants, by submitting claims as if these services were performed "incident to" a physician's professional services. *Walker*, 433 F.3d at

1352. In support of her allegation that the defendant actually submitted false claims pursuant to this scheme, the relator alleged that she never received her own independent billing code and also described conversations in which the office administrator told her that the physicians who ran the small practice "billed all nurse practitioner and physician assistant services as rendered 'incident to the service of a physician' ... [and] had 'never' billed nurse practitioner or physician assistant services in another manner." *Id.* at 1360. The Eleventh Circuit found these corroborating facts "sufficient to explain why [the relator] believed [the defendant] submitted false or fraudulent claims." *Id.*

In contrast, Aquino—who worked at a satellite office of a major metropolitan healthcare provider and sometimes processed bills sent to a separate department which actually submitted claims—has not offered facts sufficient to support her belief that UM submitted false or fraudulent claims in collusion with De La Cruz. Instead, she simply concludes that "[UM Hospital] was to bill Medicare for the 'hospital component' for the operating room, hospital room, medical supplies, and other in-hospital care" for uncovered VSG procedures (DE 48 ¶ 42) and that "[o]ther [UM Miller School of Medicine] departments that provided in-hospital services to the [VSG] patients were to bill Medicare for said services independently" (DE 48 ¶ 43). But unlike the relator in *Walker*, Aquino fails to allege any conversations with other personnel or other persuasive reasons why she possessed knowledge of UM's claims submission procedures, let alone knowledge of specific claims connected to the

---

**6.** It should also be noted that the relator in *Mastej* alleged a scheme based on illegal kickbacks. Kickback cases differ from cases like this one, where the "allegation is that a defendant's Medicare claim contained a false statement ... [and] representative claims with

particularized medical and billing content matter more, because the falsity of the claim depends largely on the details contained within the claim form." *Mastej*, 591 Fed.Appx. at 708.

alleged schemes. The closest she comes to offering an adequate reason are her allegations that De La Cruz directed her and others to tell patients that "Medicare would pay everything other than the surgeon's fee" for the VSG procedures even though Medicare did not cover VSG (DE 48 ¶¶ 58–59) and that De La Cruz altered patient weight and height data or instructed subordinates to do so in her presence (DE 48 ¶ 48). These allegations, while indicative of substandard internal practices at De La Cruz's satellite office, do not support an unconnected inference that UM's billing department actually submitted false claims to Medicare on De La Cruz's behalf by misrepresenting patient data or the nature of the services provided.

Further, Aquino's reliance on *Mastej* and *Walker* is misplaced because these cases do not stand, as she claims, for the rule that any *qui tam* suit brought by a manager and decision-maker survives a motion to dismiss. Instead, these and similar cases stand for a more constrained proposition: a relator's firsthand knowledge of a defendant's actual submission of false claims may, where supported by appropriate factual allegations, provide "sufficient indicia of reliability" to substitute for the particularized allegations that Rule 9(b) generally requires. *Mastej*, 591 Fed. Appx. at 708; *see also Hill*, 2003 WL 22019936, at *5 (reversing district court's dismissal of complaint that did not allege submission of a specific false claim because the relator was an employee "within the billing and coding department" who "witnessed firsthand the alleged fraudulent submissions" thus providing the "indicia of reliability" required by Rule 9(b)); *Walker*, 433 F.3d at 1359–60.

This narrow exception to the rigorous 9(b) standard offers Aquino no basis for her claims. The FAC alleges a scheme to defraud Medicare and concludes that Defendants were submitting false claims in relation to this scheme, but offers few if any facts to corroborate that conclusion or to demonstrate Aquino's firsthand knowledge of false claims being submitted. This deficiency distinguishes this case not only from *Mastej* and *Walker* as described above, but also from *Matheny*, in which the relator directly participated in the defendant's scheme to retain Medicare overpayments; and from *Hill*, in which the relator was a billing department employee who witnessed the submission of false claims firsthand. *Matheny*, 671 F.3d at 1220–21 (11th Cir. 2012) (reversing district court's grant of defendants' motion to dismiss FCA claims where the relator attended meetings at which the defendants were apprised of Medicare overpayments that needed to be refunded and then personally helped implement the defendants' scheme to obscure and retain those overpayments); *Hill*, 2003 WL 22019936, at *5. Consequently, the Court dismisses Counts 1 and 2 because the FAC alleges neither an actual false claim with the particularly required by Rule 9(b), nor a sufficient factual basis to show that Aquino was personally in a position to know that Defendants submitted actual false claims to the government.

## B. Retaliatory Discharge

Count 3 of the FAC alleges that Defendants discharged Aquino in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1), after she complained to UM administrators and to De La Cruz about what she perceived as the illegality of his office practices. Defendants move to dismiss Count 3 in its entirety, but the Court finds dismissal appropriate only as to Count 3's allegations against De La Cruz.

Aquino's retaliatory discharge claim against De La Cruz is time-barred. 31 U.S.C. § 3730(h)(3) ("A civil action under

[31 U.S.C. § 3730(h)] may not be brought more than 3 years after the date when the retaliation occurred."). The FAC alleges that Aquino's employer—in her positions as a Patient Access Coordinator, Senior Surgical Coordinator, and a Senior Access Supervisor—was the UM Miller School of Medicine. (DE 48 ¶ 16). In Aquino's role as Senior Access Supervisor, De La Cruz was her supervisor, not her employer. (DE 48 ¶ 26). To the extent De La Cruz employed Aquino in his individual capacity,[7] he did so only to have her "perform custodial and miscellaneous clerical duties . . . after her regular work hours." (DE 48 ¶ 33).

Courts have regularly found that "FCA [anti-retaliation] liability is limited to 'employers'" as opposed to supervisors or managers. *Frett v. Howard Univ.*, 24 F.Supp.3d 76, 86 (D.D.C. 2014) (compiling cases); *see also Lipka v. Advantage Health Grp., Inc.*, No. 13-CV-2223, 2013 WL 5304013, at *10–12 (D. Kan. Sept. 20, 2013) (explaining why Congress did not intend the 2009 amendments to § 3730(h) to extend liability to supervisors and managers in addition to employers). Thus, Aquino is only able to bring an FCA retaliation claim against De La Cruz in relation to the secondary "custodial and miscellaneous clerical" duties for which he employed her in his individual capacity. But Aquino first alleged this secondary category of employment when she filed the FAC on January 25, 2016—over three years after the alleged retaliatory events. Aquino's response—that the original Complaint, filed within the statute of limitations, alleges that both De La Cruz and UM retaliated against her—is unpersuasive because FCA anti-retaliation liability is limited to "employers" and the Complaint, unlike the FAC, never alleged that De La Cruz employed Aquino in his individual capacity. Accordingly, Count 3 as alleged against De La Cruz is dismissed as time-barred pursuant to 31 U.S.C. § 3730(h)(3).

What remains of Count 3—Aquino's claim that UM illegally discharged her in retaliation for complaints to superiors—survives Defendants' motion to dismiss. The FCA's anti-retaliation provision provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C.A. § 3730(h)(1). "[T]o plead an FCA retaliation claim, a plaintiff must allege that (1) she engaged in lawful acts in furtherance of an FCA action or endeavored to prevent at least one violation of the FCA; and (2) she was, as a result, subjected to some form of discrimination in the terms and conditions of her employment." *Reddick v. Jones*, No. 1:14-CV-00020-AT, 2015 WL 1519810, at *4 (N.D. Ga. Mar. 11, 2015) (citations omitted); *see also Sanchez*, 596 F.3d at 1304.

---

7. Defendants, pointing to exhibits attached to their motion to dismiss, claim that De La Cruz's business, Nelson De La Cruz Munoz, MD PA—and not De La Cruz himself—was Aquino's employer for the unspecified custodial and clerical work. (DE 49 at 2–3; DE 49-1). On a motion to dismiss, a court normally must not consider anything beyond the face of the complaint and documents attached thereto. *Financial Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). As such, the Court will accept the facts alleged in Aquino's FAC as true and for purposes of deciding this motion assumes that De La Cruz employed Aquino for clerical work in his individual capacity.

■ As to the first element, "[i]f an employee's actions ... are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *Sanchez*, 596 F.3d at 1304 (citing *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1314 (M.D. Ala. 1999)). In *Reddick*, the district court found that the plaintiff plausibly alleged the first element of an FCA retaliation claim, that she was engaged in protected conduct, because she "told her employer of her concern that altering patient records ... may be fraudulent and illegal and would result in billing for amounts greater than actually due." *Reddick*, 2015 WL 1519810 at *5 (quotation marks omitted). Although the FAC does not allege that Aquino raised specific concerns about the submission of false claims, it does allege that she "raised concerns several times" about the "legality of charging/billing Medicare clients $2,500" to UM administrator Lilliam Dana and De La Cruz (DE 48 ¶¶ 61–62) and that she "questioned [De La Cruz] on how the hospital and the other [UM Miller School of Medicine] providers rendering in-hospital services to the patients were paid." (DE 48 ¶ 63). Together, and viewed in the light most favorable to Aquino, the nature of these complaints supports a reasonable conclusion that UM may have feared being reported to the government for fraud or sued in *qui tam*.

■ The FAC also satisfies the second element required to state an FCA anti-retaliation claim. "To satisfy the second element of an FCA anti-retaliation claim, a plaintiff must allege a causal connection between her protected conduct and the resultant discrimination in employment." *Mann*, 49 F.Supp.2d at 1316. Such a showing is "not onerous," as a plaintiff must "merely [ ] prove that the protected activity and the negative employment action are not completely unrelated." *Id.* (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)). "Temporal proximity is sufficient to raise an inference of causation" and "a period of at least two and a half months between the plaintiff's first complaints to her employer and her layoff ... [is] sufficient to raise an inference of causation between the protected conduct and the adverse action." *Reddick*, 2015 WL 1519810, at *5 (citing *United States ex rel. Vargas v. Lackmann Food Service, Inc.*, 510 F.Supp.2d 957, 967 (M.D. Fla. 2007)). Defendants argue that Aquino fails to allege that her complaints to supervisors were the "but-for" cause of her termination, pointing to the two-year delay in Aquino's filing of this lawsuit and her *nolo contendere* plea to criminal theft charges as further evidence of the absence of a causal link. Their arguments implicitly rely on the notion that Aquino's theft from De La Cruz's office was the real reason for her termination

These arguments are unpersuasive in that they urge the Court to make premature credibility determinations about the FAC's allegations. At this stage, the Court must assume, as the FAC alleges, that after Aquino raised complaints to Dana and De La Cruz in late 2011, De La Cruz contrived a series of false allegations against her and pressured law enforcement to take action, which law enforcement then did. (DE 48 ¶¶ 73, 87). The FAC contains numerous factual assertions backing these allegations of contrivance, including that Aquino consistently denied all accusations against her (DE 48 ¶¶ 76, 81), offered alternative explanations for the alleged theft (DE 48 ¶ 77), "agreed to replace the allegedly missing money ... for the sole purpose to avoid losing her job" (DE 48 ¶ 80), and demanded unsuccessfully that De La Cruz produce a video he claimed to have of the theft (DE 48 ¶ 82).

According to Aquino, UM then used De La Cruz's false theft allegations as pretext to fire her without conducting any investigation. The FAC also explains that Aquino "was forced to defend the contrived criminal charges against her and settle same" (DE 48 ¶ 89) and "was forced to challenge [Defendants'] false assertions before the State of Florida in order to receive unemployment compensation after her termination, which she was ultimately awarded." (DE 48 ¶ 90). These allegations, and the temporal proximity between Aquino's complaints and her discharge, satisfy the causation element of Aquino's FCA retaliatory discharge claim against UM. Accordingly, Defendants' motion to dismiss is denied with respect to the allegations in Count 3 against UM.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (DE 49) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Counts 1 and 2 of the FAC are **DISMISSED WITH PREJDUCE** in light of the Court's prior notice at the November 23, 2015 status conference that the FAC would be Aquino's final chance to meet the FCA pleading standard.

2. Count 3 of the FAC as alleged against Defendant Dr. Nelson De La Cruz–Muñoz is time-barred pursuant to 31 U.S.C. § 3730(h)(3) and is therefore **DISMISSED WITH PREJUDICE.**

3. This case proceeds only as to Count 3 of the FAC as alleged against Defendant University of Miami.

4. In light of this Order, Defendants' request for attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(4) is **DENIED.**

**DONE AND ORDERED** in chambers in Miami, Florida, this 26th day of April 2017.